UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SACS GLOBAL TRUST & MORTGAGE, LLC<br>F. K. A. GREENWICH GLOBAL TRUST &<br>MORTGAGE, INC. | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | |
| V. | | |
| | : | |
| MATTHEW J. THOMAS, THOMAS CAPITAL<br>MORTGAGE, LLC, AND MJT ASSET<br>PROTECTION TRUST I | : | |
| | : | |
| Defendants. | : | August 4, 2006 |

COMPLAINT

As and for its Complaint SACS Global Trust & Mortgage, LLC f/k/a Greenwich Global Trust & Mortgage. Inc. ("SACS") hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.   Defendant Matthew J. Thomas ("Thomas") is a professional employed in the venture capital area and from February 2004 to March 31, 2005, he served as the Chief Executive Officer and Senior Managing Member of the Daedalus Capital Relative Value Fund I, LLC ("The Fund"), a client of the Daedalus Capital Partners, LLC ("DCP"), a Delaware limited liability company, which served as the non-member manager of the Fund. The Fund was used as an instrument to advance a fraudulent scheme by Thomas, as well as, other principals of the Fund, including but not limited to, Michael J. Legamaro, the former General Counsel of the Fund, Robert N. Chan, the former Associate Counsel of the Fund, Ralph Hallenborg, the former Chief

Executive Officer of the Fund and its affiliate The Deeds Group, LLC; Preston Tsao, former marketing officer of the Fund, and Lisa LaBonte, also a marketing officer of the Fund, to defraud investors and other interested parties. In connection with its fraudulent scheme, Thomas in concert with other principals of the Fund, concealed and did attempt to conceal through the use of Promissory Notes (Notes) payable to SACS, and through derivative agreements, the transfer and/or investment losses of $696,000.30 in the Fund.  As a result of defendant Thomas', deceptive and fraudulent acts, omissions, and conversion SACS has been damaged in the amount of at least $696,000.30. Further, the defendant Thomas Capital Mortgage, LLC ("TCM"), is a limited liability company and is owned and operated by Thomas and also serves as the Trustee of the MJT Asset Protection Trust I.. The defendant MJT Asset Protection Trust I ("MJT Trust") is an Asset Protection Trust organized and existing under the laws of the State of Delaware and is titled to defendant Thomas. In this lawsuit, SACS seeks repayment of at least. 696,000.30, plus accrued interest under the terms of the Notes, as wall as, any and all costs of collection.

## JURISDICTION AND VENUE

2. This Court has diversity under 28 U.S.C. § 1332, because this is an action between citizens of different states in which the amount in controversy is over the sum or value of $75,000, exclusive of interests and costs.

3. Venue is proper under 28 U.S.C. § 1391 (a)(2) because a substantial part of the events and omissions took place in Connecticut.

PARTIES

4. The plaintiff, SACS Global Trust & Mortgage, LLC f/k/a Greenwich Global Trust and Mortgage, Inc. ("SACS"), is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Greenwich, Connecticut and authorized to do business in the State of Connecticut, SACS is successor-by-merger to Greenwich Global Trust & Mortgage, Ins,

5. Upon information and belief, defendant Matthew J. Thomas (Thomas) is a resident of the State of New York, living at 455 W. 23rd Street, Suite 11A, New York, NY 10001.

6. Upon information and belief, defendant Thomas Capital Mortgage, is a limited liability company with an office at 455 W. 23rd Street, Suite 11A New York, NY 10001, and serves as trustee to the MJT /½set on Trust.

7. Upon information and belief, defendant MJT Asset Protection Trust I ("Trust") is an asset protection trust organized and existing under the laws of the State of Delaware with its principal beneficiary being Thomas , and with an address of 455 W. 23rd Street, New York, NY 10001, and its principal Bank account located at the Bank of New York.

STATEMEMNT OF FACTS

8.     In or about February, 2004, Thomas became involved in an entity then known as Yasam Trading, LLC ("Yasam"), and later known as Daedalus Capital Partners, LLC ("DCP"). THomas at all times served as the Chief Executive Officer and Senior Managing Member of these entities.

9.     In or about February, 2004, Thomas recruited, amongst others, Hakan Yalincak ("Yalincak"), and was joined by Michael J. Legamaro ("Legamaro"), Mary E. Sichuan ("Siachitano"), and Thomas W. Andersen, Sr. to commence investment operations at DCP and Yasam.

10.    In or about February 2004, Andersen refeered Joseph Cannavo and Leonard Cannavo ("the Cannavos") to Yasam for the purposes of refinancing certain loans through Interest Rate Sawp Transactions (the "Swap Transactions") pursuant to a written International Swap Dealers' Association Agreement ("ISDA Agreement"), which are governed and binding under New York State law.

11.    Between February 2004, and November 1, 2004, the Cannavos deposited and caused to be deposited approximately $1,045,000.00 with Yasam pursuant to the ISDA Agreement, and upon advice and consultation with Andersen, who served as their accountant and Legamaro who served as counsel to the Cannavos and provided information to the Cannavos attorney Anthony E. Mattessi.

12.    Between February 2004, and November 1, 2004, the Cannavos received approximately $363,000.00 via wire.

13. In or about October 2004, upon the advice of Andersen, the Cannavos executed subscription documents for membership interest in the Fund, for an initial capital account of $1,050,000.00.

SUBSEQUENT DISCOVERIES

14. In or about May 2004, Thomas came under Federal Criminal Investigation in connection with a Credit Card Kiting scheme, which cost First USA (Bank One) in excess of $400,000.00.

15. Thomas became aware of the Federal Criminal Investigation an Thomas then knowingly and willfully did combine, conspire, confederate, and agree with other executives of the Fund to devise a scheme and artifice to defraud , and to obtain monies to repay First USA (Bank One), and to conceal the true operating and financial nature and condition of the Fund, from investors, financial .institutions and federal authorities..

16 In or about May 2004, Thomas did submit and did cause to be submitted a letter purportedly on Yasam letterhead to his landlord, London Terrace Gardens, indicating that he was a Senior Manager of Yasam, and earning a six-figure salary.

17. In or about June 2004, Thomas would and did solicit and would and did obtain money, in the approximate amount of $400,000, as investments, from several individuals, by

falsely representing that the monies of each would be invested, under DCP and Yasam's management, in various financial markets, amongst other misrepresentations, whereas, Thomas, TCM, MJT Trust, and certain senior executives of the Fund, then and there knew and believed , a substantial sum of the money would be used for purposes other than investments, including their own enrichment.

18. The defendants, Thomas, TCM, MJT Trust, and certain senior executives of the Fund would and did conceal, and would and did attempt to conceal their fraudulent conduct from some or all of the investors by falsely representing the value of the investments being managed, and the share of certain investors in those investments, including returns on their investments.

## DEFENDANTS' ATTEMPTS TO CONCEAL FRAUD

19. In or about July 2004, Thomas called the US Postal Inspector, who was involved in the investigation, while he, Thomas, was on vacation in London, UK at the Wimbleton Tennis Tournament, in an attempt to obstruct the Federal Criminal Investigation.

20. In or about August 2004, the defendants, Thomas, TCM, and MJT Trust, upon learning that Dresdner Kleinwort Wassertein Securities, LLC ("Dr KW"), had placed a hold on an investment account with at least $696,000 of investments belonging to investors in the Fund, would and did solicit and would and did obtain additional monies, as investments, from several individuals, by false and fraudulent representations to conceal these losses.

21.     In or about October 2004, the defendants, Thomas, TOM, aid MJT Trust. And senior executives of the Fund, would and did solicit and would and did obtain additional monies, as investments, from several individuals, by false and fraudulent representations to conceal these losses.

## NOTE SCHEME

22.     In or about May 30, 2004, Thomas entered into an individual loan agreement (the "Original Note"[1]) with SACS and obtained thereby an immediate loan for and on behalf of the Fund.

23.     Thomas, as Chief Executive Officer of the Fund, arranged for the Fund to invest 230,000.00 in SACS so the loan could be funded. As a result, SACS now owed the Fund $230,000.00, and Thomas owed SACS $230,000. SACS was to service the loan for and on behalf of the Fund.

24.     The Original Note provided for no principal or interest payments at the outset, but for interest to accrue at a rate of 10.47% per annum beginning on December 15, 2004, and on the fifteenth day of each successive month, defendant Thomas was obligated to pay $25,408.10. The Original Note had a maturity date of the earliest to occur of (a) September 15, 2005, (b) SACS' demand or, (c) the date of acceleration.

25.     Thereafter, but before the first installment payment came due, Thomas made arrangements to increase the amount of the Note by more than $465,000.00 to $696,000.30.

26.     On or about November 1, 2004, the Original Note was replaced when SACS, Thomas, and Healey entered into a new demand promissory note and obtained thereby an immediate loan of 696,000.30, part of which was used to retire the original Note (the "Replacement Note").

27.     Thomas, as Chief Executive Officer of the Fund, arranged for the Fund to invest an additional $465,000.30 in SACS so the loan could be funded.  As a result, SACS now owed the Fund, $696,000.30, and Thomas owed SACS $696,000.30.  SACS was to service the loan, for a fee, for and on behalf of the Fund.

28.     The Replacement Note included a repayment schedule providing for interest to accrue at a rate of 10.47% per annum beginning on December 15. 2004.  Commencing on December 5, 2004, and on the 15th day of each of the next nine (9) successive months, Thomas was obligated to pay $76,776.68. The Replacement Note had a maturity date of the earliest of September 15, 2005, SACS' demand or the date of acceleration.

29.     In Section 8(e) of the Replacement Note, Thomas agreed to accept service by regu1ar mail. Specifically, Thomas agreed "that effective service may be made on [Thomas] by mailing same to [Thomas'] address set forth below".

30.     In connection with the execution of the Replacement Note, Thomas delivered to SACS, (i) a co-signer named Joseph Healey ("Healey"), (ii) a Guarantyfrom Healey ("Healey") in favor of SACS and guaranteeing Thomas' obligation under the loan, (iii) a Pledge Agreement granting as collateral interst in 1,105,129.30 units of Daedalus Capital Relative Value Fund I, LLC, then held by Healey an investor in the Fund.

31.     Subsequently, SACS has learned Healey never executed, nor authorized, the Replacement Note, Guaranty, or Pledge Agreement (collectively "the Agreements").

32.     Subsequently, SACS has learned that the Original Note and Replacement Note were a part of a scheme to defraud investors in the Fund. And misappropriate, convert, and use monies belonging to investors in the Fund for amongst tother things, payments to employees of the Fund; transfers to personal asset protection vehicles, such as defendant MJT Trust; as well as, personal purchases, which included the purchase of a Porsche Cayenne SUV titled to Mary E. Siachitano, the girlfriend of Michael J. Legamaro, the former General Counsel of the Fund; personal trips such as defendant Thomas' June 2004 trip to London UK to attend the Wimbleton Tennis Tournament.

33.     On December 15, 2004, when the first payment on the Replacement Note became due, Thomas failed to make the required payment, said failure constituted a default on the Agreement by Thomas.

34.     SACS performend all of its obligations under the Replacement Note.

35..    SACS has made subsequent demands for Thomas to pay the amounts due and owing under the Replacement Note. Thomas has failed to do so,

### SACS MEMBER ENTERS INTO FORFEITURE AGREEMENT

36.     On January 13, 2006, Yalincak, a junior member of SACS a member of SACS and the Fund entered into a forfeiture agreement with the United State Attorneys' Office for the District of Connecticut.

37.     Pursuant to the terms and conditions of the said Agreement any and nll funds recovered in the presoecution of this matter, will be used to repay investors or forfeited to the government to be used to restitution to investors in the Fund.

### COUNT I :FRAUD

1-37    SACS hereby repeats and incorporates the allegations contained in Paragraphs 1-37, above, as if fully set forth herein.

38.     As a result of the conduct alleged herein, the Defendant knowingly made fraudulent representations and omissions of material facts with respect to the Original Note, Replacement Note, and the Funds true financial condition and operating condition, by inter alia issuing false and misleading statements and reports regarding the Fund' existence and financial condition.

39. The Defendants made such representations and omissions of material fact with the actual intent of that the plaintiff would rely upon them.

40. The plaintiff reasonably relied upon such representations and omissions of material fact to its deteriment.

41. By reason of the fraudlent conduct of each of the defendants, the plaintiff has been damaged in the amount of at least 696,000.30 or such other amount to be determined at trial.

## COUNT II BREACH OF CONTRACT

1-41   SACS hereby repeats and incorporates the allegations contained in Paragraphs 1-41 as stated in Count I as if fully set forth herein.

42. The entire principal amount of $696,000.30 plus accrued interest is due and owing in full by Thomas, Thomas has failed to repay any paert of that amount despite demand. Thomas is therefore in default under the terms of the Replacement Note.

WHEREFORE, the plaintiff SACS, respectfully prays for relief and judgment as follows:

1. Awarding the Plaintiff incidental and compensatory damages against all defendants;

2. Awarding the Plaintiff actual damages pursuant to Conn.Gen Stat. §42-110(g) a;

3. Awarding the Plaintiff punitive damages pursuant to Conn.Gen Stat.§42-110(g) a;

4. Awarding the Plaintiff's costs and Attorneys Fees pursuant to Conn.Gen Stat.

§42-110(g) a;

    5.    Awarding the Plaintiff the sum of 696,000.30 together with unpaid interest, default interest and prejudgment judicial interest as applicable pususant to Conn. Gen. Statutes §36-29(a);

    6.    Awarding the Plaintiff's costs and disbursements incuured in this action.

    7.    Awarding the Plaintiff such other and further relief, both legal and equitable as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the plaintiff demands a trial by jury as to all issues so triable.

Please Enter the Appearance of

> Robert A. Byers, Esq.,
> 212 South Main Street
> Thomaston, CT 06787
> Tel 860 283 6933
> Fax 860 283 6533
> Fed Bar # ct-11619
> E-Mail AttyByers@aol.com

> PLAINTIFF, SACS GLOBAL TRUST &
> MORTGAGE, LLC

> By_____
>     Robert A. Byers, Esq. (ct 11619).
>     212 South Main Street
>     Thomaston, Connecticut 06787

(860) 283-6933 Tel.
(860) 283-6533 Facsimile,
AttyByers@ao1.com  E-Mail